UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBIN DEPUTY, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 1:13-cv-412-JMS-DKL |
| | ) | |
| CITY OF SEYMOUR, *et al.*, | ) | |
| *Defendant.* | ) | |

## ORDER

Plaintiff Robin Deputy filed this civil action against Defendants City of Seymour ("Seymour") and Police Chief William Abbott ("Chief Abbott") after she was terminated after she refused to take a portable breath test after being ordered to come to work. In relevant part, Ms. Deputy brings a claim pursuant to 42 U.S.C. § 1983, alleging that that her Fourth Amendment rights, as made applicable to the states by the Fourteenth Amendment, were violated. [Filing No. 1 at 5.] Currently pending before the Court is Defendants' Motion for Summary Judgment, which seeks an entry of judgment in favor of Defendants on all of Ms. Deputy's claims. [Filing No. 38.] For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment. [Filing No. 38.]

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by

showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the

cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson, 325 F.3d at 898*. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The following facts are undisputed, unless otherwise noted. Ms. Deputy worked as a dispatcher for the City of Seymour from March 2010 to August 2012. [Filing No. 36-1 at 4; Filing No. 36-3 at 4.] Dispatchers are members of the communications section and are responsible for all incoming emergency 911 calls within Seymour and for dispatching police and fire services. [Filing No. 36-1 at 1.] They serve as the anchor for all communications involving police officers and firefighters, [Filing No. 36-1 at 1; Filing No. 36-3 at 5], and are considered safety sensitive employees, [Filing No. 43-2 at 28]. Ms. Deputy was an at-will employee. [Filing No. 42 at 10.]

Two dispatchers are typically on duty at one time—one dispatcher handles incoming 911 emergency calls and the other dispatches for the police officers concerning traffic stops. [Filing No. 36-3 at 5.] There are three eight-hour shifts of dispatchers, [Filing No. 36-1 at 1], and Ms. Deputy typically worked the 11:00 p.m. to 7:00 a.m. shift, [Filing No. 36-3 at 5]. She typically worked eighty hours per pay period. [Filing No. 36-3 at 5.]

The communication section offers dispatchers two distinct opportunities for overtime hours. [Filing No. 36-3 at 5-6; Filing No. 43-2 at 41.] Through voluntary overtime, dispatchers can sign up to cover shifts for scheduled absences. [Filing No. 36-3 at 5-6.] In the event of unforeseen absences, dispatchers on the overtime call-out list are asked to take overtime to cover

a vacant shift. [Filing No. 43-2 at 41; Filing No. 36-1 at 2.] All available dispatchers are on the call-out list, and the dispatcher currently on duty will call the other dispatchers in the order they are listed. [Filing No. 36-1 at 2.] If a dispatcher agrees to fill the vacancy, his or her name is moved to the bottom of the list. [Filing No. 36-1 at 2.] If no one accepts the overtime, then the dispatcher on duty has to call the other dispatchers again in the order they are listed. [Filing No. 36-3 at 6.] Someone usually accepts the overtime, [Filing No. 36-3 at 12], but on those rare occasions that no one does, it is permissible for a dispatcher to work alone, [Filing No. 36-3 at 13], or for a police officer to help cover the shift, [Filing No. 43-2 at 42-43].

On Saturday, August 25, 2012, Ms. Deputy had the day off. [Filing No. 36-3 at 6.] She arrived at a neighbor's mobile home between 9:00 a.m. and 10:00 a.m. to help tear it down with her mother and husband, and she worked there until around 4:30 p.m. [Filing No. 36-3 at 6-7.] Ms. Deputy, who was fifty years old, consumed six to eight beers and one wine cooler during that time. [Filing No. 36-3 at 7; Filing No. 36-3 at 9.] After she finished helping tear down the mobile home, Ms. Deputy returned home and had another wine cooler. [Filing No. 36-3 at 7.] She left for an auction around 5:30 p.m., returned home around 9:30 p.m., and she did not consume any alcoholic beverages during the auction. [Filing No. 36-3 at 7-8.]

Meanwhile, around 8:20 p.m., a dispatcher who was scheduled to work the 11:00 p.m. to 7:00 a.m. shift called in sick. [Filing No. 36-1 at 3.] Calls were made to the nine dispatchers on the overtime call-out list, but there were no volunteers. [Filing No. 36-1 at 3; Filing No. 43-2 at

41.]  Ms. Deputy's name was on the top of the overtime call-out list.[1]  [Filing No. 43-2 at 4.]

While she was at the auction, Ms. Deputy received a voicemail on her cell phone from dispatcher

Lori Pearson, informing Ms. Deputy of the overtime opportunity.  [Filing No. 36-1 at 3; Filing

No. 36-3 at 8.]  Ms. Pearson also called Ms. Deputy's home phone number but did not leave a

message when no one answered.  [Filing No. 36-1 at 3.]  Sergeant Mike Cooper called Chief

Abbott to inform him that no one had accepted the overtime, and Chief Abbott had Sergeant

Cooper send an officer to Ms. Deputy's house to make contact with her.  [Filing No. 43-2 at 4.]

When Ms. Deputy returned home from the auction barn, Jennings County Sheriff's

Deputy Officer Jones was in her driveway with his squad car lights flashing.[2]  [Filing No. 36-3 at

8.]  Officer Jones told Ms. Deputy that the Seymour Police Department had requested that she

call work.  [Filing No. 36-3 at 8-9.]  Officer Jones left Ms. Deputy's residence after she told him

that she would make the call.  [Filing No. 36-3 at 8-9.]  Ms. Deputy spoke with Sergeant Cooper,

who she admits ordered her to come to work.  [Filing No. 36-3 at 9 ("Q He ordered you to come

in to work? A Yes.").]  Ms. Deputy responded, "Okay, well, I've been drinking."  [Filing No. 36-

3 at 9.]  Sergeant Cooper replied that he would tell Chief Abbott.  [Filing No. 36-3 at 9.]  The

---

[1] Ms. Deputy was on the top of the overtime call-out list from April 30, 2012, through August 25, 2012.  [Filing No. 36-1 at 2.]  Chief Abbott attests that there were 28 occasions for dispatchers to fill unexpected absences during that time; five of those incidents were where Ms. Deputy called in sick or was already working; and during 22 of them Ms. Deputy either refused to work the overtime or could not be contacted.  [Filing No. 36-1 at 2.]  Chief Abbott attested that his records indicate that on August 18, 2012, Ms. Deputy signed up to work an overtime shift but that there is no indication that she did so because her name was not removed from the top of the overtime call-out list.  [Filing No. 36-1 at 2.]  Ms. Deputy does not dispute the accuracy of her place on the overtime call-out list on the date in question.  [See Filing No. 36-3 at 6 (Ms. Deputy attesting that she was on the top of the overtime call-out list during Summer 2012 and that although she took a few hours of overtime during that period, she did not recall when that was and "there was no list filled out that would have moved me to the bottom").]

[2] There was an event in Seymour that night, which required the assistance of most of the Seymour police officers.  [Filing No. 36-1 at 3.]  Because Ms. Deputy lives in Jennings County, a Jennings County deputy was sent to her residence.  [Filing No. 36-1 at 3.]

order to report to work was not rescinded. [Filing No. 36-1 at 3 (Chief Abbott affidavit); Filing No. 36-3 at 10 (Ms. Deputy testimony agreeing that after she told Sergeant Cooper that she'd been drinking "he didn't say you don't have to come in to work").]

Sergeant Cooper called Chief Abbott and told him that Ms. Deputy did not sound like she was under the influence of alcohol but that she was not coming in because she said she had been drinking. [Filing No. 36-1 at 3; Filing No. 43-2 at 5-6.] Chief Abbott told Sergeant Cooper to send the Jennings County Sheriff's Deputy, Officer Jones, back to Ms. Deputy's residence to offer her a portable breath test ("PBT") in order to determine her level of intoxication. [Filing No. 36-1 at 3.] No policy prevented Ms. Deputy from drinking while off duty or refusing overtime. [Filing No. 43-2 at 35-36.]

Officer Jones returned to Ms. Deputy's residence approximately ten to fifteen minutes later, and she walked out to the sidewalk to meet him with a wine cooler in hand. [Filing No. 36-3 at 9-10.] Officer Jones told Ms. Deputy that Chief Abbott had ordered her to take a PBT. [Filing No. 36-3 at 9.] Officer Jones also told Ms. Deputy that since she was over the age of 21, in her residence, and had broken no laws, it was her choice to take the PBT. [Filing No. 36-3 at 9.] Ms. Deputy refused to take the PBT. [Filing No. 36-3 at 9-10.] Officer Jones told her that he would tell his dispatch and that it would notify the Seymour Police Department. [Filing No. 36-3 at 10.] Ms. Deputy had no further communication with the Seymour Police Department that evening. [Filing No. 36-3 at 10.]

The next two days, Ms. Deputy worked her regular shifts from 11:00 p.m. to 7:00 a.m. [Filing No. 36-3 at 10.] When her shift ended at 7:00 a.m. on August 28, 2012, Chief Abbott asked to speak with Ms. Deputy. [Filing No. 36-3 at 10.] Chief Abbott recorded their conversation. [Filing No. 43-5.] Chief Abbott fired Ms. Deputy and, in doing so, told her,

"[Y]ou knew that [the PBT order] was coming from me.  And I'm not happy at all.  And I've stewed on this since that night because I knew that they were going back over to get a PBT, because I told them - - because I hear that excuse all the time."  [Filing No. 43-5 at 4-5.]  Ms. Deputy questioned Chief Abbott's decision:  "Maybe I was wrong by not taking the PBT . . . But yet I'm being dismissed from my job for refusing to take a PBT . . . ."  [Filing No. 43-5 at 6.]  Chief Abbott replied:  "Uh-huh."  [Filing No. 43-5 at 6.]  No employees had previously been disciplined for not taking overtime.  [Filing No. 43-2 at 42.]

The parties dispute exactly why Ms. Deputy was fired.  Ms. Deputy testified that Chief Abbott told her she was fired because "he had an issue with [her] refusing to take a Breathalyzer test and refusing a direct order."  [Filing No. 36-3 at 10.]  Chief Abbott attests that he "decided to terminate [Ms. Deputy's] employment for making no effort to show up for work when ordered to do so."  [Filing No. 36-1 at 4.]  For purposes of ruling on this motion, the Court will assume that Chief Abbott fired Ms. Deputy for refusing his order to take the PBT.

Ms. Deputy filed a Complaint against Seymour and Chief Abbott on March 12, 2013, alleging that her termination was "in retaliation for her lawful refusal to consent to an unlawful search and seizure."  [Filing No. 1 at 1.]  She asserts claims pursuant to 42 U.S.C. § 1983 and applicable state law.  [Filing No. 1 at 5-7.]  The Defendants have moved for summary judgment on all of Ms. Deputy's claims, [Filing No. 38], and Ms. Deputy concedes in response that her

state law claims against Seymour cannot succeed, [Filing No. 42 at 2]. Thus, the only remaining claim at issue on summary judgment is Ms. Deputy's § 1983 claim against Chief Abbott.[3]

### III.
### DISCUSSION

Chief Abbott moves for summary judgment on Ms. Deputy's § 1983 claim, arguing that his order for Ms. Deputy to submit to the PBT was based on reasonable suspicion that she had been drinking and, thus, there was no Fourth Amendment violation. [Filing No. 35 at 8.] Chief Abbott also asserts a qualified immunity defense, arguing that given the "unusual circumstances" he faced, "it would not have been readily apparent to a reasonable government official that his conduct was clearly unconstitutional." [Filing No. 35 at 9.]

In response, Ms. Deputy argues that summary judgment is not appropriate because a reasonable jury could conclude that Chief Abbott fired her in retaliation for her exercising her Fourth Amendment rights. [Filing No. 42 at 10-11.] She claims that the proposed PBT test while she was off duty and at home was unreasonable, does not fit any recognized Fourth Amendment exception, and that Chief Abbott's failure to follow the City of Seymour's policies is further evidence of the unreasonableness of the attempted search, [Filing No. 42 at 20-21]. Ms. Deputy contends that the Court should reject Chief Abbott's qualified immunity defense because the law against retaliation for exercising constitutional rights is well established. [Filing No. 42 at 23-24.]

---

[3] Although Ms. Deputy's Complaint asserts her § 1983 claim against both "Defendants," [Filing No. 1 at 5], it does not appear that she intended to pursue a § 1983 claim against Seymour. To maintain a viable § 1983 action against a municipality like Seymour, "a plaintiff must demonstrate that a constitutional deprivation occurred as the result of an express policy or custom of the government unit," *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002) (citing *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001)). In response to Defendants' Motion for Summary Judgment on all of Ms. Deputy's claims, Ms. Deputy does not respond that she is asserting a claim of this nature against Seymour. [Filing No. 42.] If Ms. Deputy intended to assert such a claim, the Court finds it to be waived.

In reply, Chief Abbott again stresses what he believes to be the reasonableness of his order for Ms. Deputy to take a PBT, given the safety sensitive nature of her position and her admission that she had been drinking.  [Filing No. 46 at 2-4.]  He points out that Ms. Deputy cites no case law that demonstrates that the order to submit to the PBT was an unreasonable search and that she fails to demonstrate that the law in this area is clearly established.  [Filing No. 46 at 8-10.]  In addition, Chief Abbott argues that he is entitled to qualified immunity. [Filing No. 46 at 8-10.]

### A. Generally Applicable Law

#### i. Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It is applicable to the states through the due process clause of the Fourteenth Amendment.  *Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949).  "The Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable."  *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989).  Subjecting a person to a breathalyzer test implicates concerns about bodily integrity and is deemed a search for purposes of the Fourth Amendment.  *Id.* at 616-17.

#### ii. 42 U.S.C. § 1983

Section 1983 provides that "[e]very person who, under color of any . . . State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in the action at law."  42 U.S.C. § 1983.  Actions by a police officer in his or her capacity as a police officer are considered acts taken "under color of" state law.  *Gibson v. City of Chicago,*

910 F.2d 1510, 1516 (7th Cir. 1990). Because § 1983 protects a plaintiff from constitutional violations, evidence of violations of departmental regulations, policies, or practices is irrelevant. *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). A § 1983 claim "allow[s] a plaintiff to seek money damages from government officials who have violated [her] Fourth Amendment rights." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

### iii. Qualified Immunity

"Government officials performing discretionary functions enjoy a qualified immunity . . . ." *Leaf v. Shelnutt*, 400 F.3d 1070, 1079 (7th Cir. 2005). It is "*immunity from suit rather than a mere defense to liability.*" *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 988 (7th Cir. 2012) (emphasis in original) (citation and quotation marks omitted). "Qualified immunity gives government officials 'the benefit of legal doubts.'" *Rooni v. Biser*, 742 F.3d 737, 743 (7th Cir. 2014) (quoting *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991)); *see Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ("Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties."). Its purpose is "to provide reasonable notice to government officials that certain conduct violates constitutional rights before a plaintiff can subject them to liability." *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Once the defense of qualified immunity is raised, 'it becomes the plaintiff's burden to defeat it.'" *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

"To determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). The Court may decide these factors in either order. *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). If the right at issue was not clearly established at the time of the violation, the Court may exercise its discretion not to determine whether the defendant violated that plaintiff's constitutional right. *See Pearson*, 555 U.S. at 236 ("[T]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *Easterling v. Pollard*, 528 Fed. Appx. 653, 657 (7th Cir. 2013) (deciding to bypass the first qualified immunity question because "[t]his issue of religious discrimination in prison poses one of the knottiest problems in First Amendment jurisprudence . . ." and deciding to address only the second qualified immunity question).

To determine whether a right is clearly established, the Court looks to controlling precedent from both the Supreme Court and the Seventh Circuit Court of Appeals, and if there is no such precedent it "cast[s] a wider net" and examines "all relevant case law to determine whether there was such a clear trend in the case law that [it] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 731 (7th Cir. 2013). "To be clearly established at the time of the challenged conduct, the right's contours must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,' and 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Rabin v. Flynn*, 725

F.3d 628, 632 (7th Cir. 2013) (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012)). "Importantly, the right must be clearly established in a particularized sense, rather than in an abstract or general sense." *Abbott*, 705 F.3d at 731.

**B. Alleged Violations of Ms. Deputy's Fourth Amendment Rights**

In response to the motion for summary judgment, Ms. Deputy argues that Chief Abbott is not entitled to summary judgment "because the law is clearly established that the government as an employer cannot drug test off-duty employees in their homes without a warrant or any suspicion of illegal activity or workplace misconduct, or retaliate against the objecting employee for exercising their constitutional right to refuse such searches." [Filing No. 42 at 1.] This response frames Ms. Deputy's § 1983 claim as two types of alleged constitutional violations—1) a Fourth Amendment claim for Chief Abbott allegedly violating her right to be free from unreasonable searches and seizures by ordering her to submit to a PBT, and 2) a retaliation claim based on her subsequent termination, which she contends was the result of her exercising her Fourth Amendment rights. The Court will address each in turn.

    *i.     Fourth Amendment Claim*

It is undisputed that subjecting Ms. Deputy to a PBT would be considered a search for Fourth Amendment purposes. [Filing No. 35 at 7 (citing *Skinner*, 489 U.S. at 616-17).] But Ms. Deputy refused to consent to the search request, [Filing No. 36-3 at 9-10], and had no further communication with the Seymour Police Department after Officer Jones left, [Filing No. 36-3 at 10]. Thus, as Chief Abbott points out, it appears that "there was only an attempted search at best" and that Ms. Deputy's complaints are "actually about the consequences suffered due to the refusal of the PBT and/or her failure to show up for work as ordered." [Filing No. 35 at 6-7.] While Ms. Deputy's Fourth Amendment claim may fail on this basis alone, she disputes the

Fourth Amendment reasonableness of Chief Abbott's order on its face. [Filing No. 42 at 16 (citing case law about the reasonableness of searches and concluding that "Chief Abbott needed a warrant, Mrs. Deputy's consent, or at least probable cause before ordering Mrs. Deputy to submit to the PBT").]

Even making every inference in favor of Ms. Deputy by assuming that Chief Abbott's order was unreasonable pursuant to the Fourth Amendment, the Court concludes that her Fourth Amendment claim still fails as a matter of law.[4] The Fourth Amendment protects public employees, but it does not given them greater workplace rights than private sector employees. *Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014). "As in the private sector, public employees must often comply with their supervisors' orders and can suffer consequences at work for failure to comply." *Id.* "The Fourth Amendment does not protect against the threat of job loss." *Id.* at 544 (holding in the context of a § 1983 claim that although an officer in the plaintiff's position may have feared job-related consequences if he did not consent to be searched, "the potential for work-related discipline is not sufficient to succeed on a Fourth Amendment claim"); *see also Driebel v. City of Milwaukee*, 298 F.3d 622, 642 (7th Cir. 2002)

---

[4] The parties dispute whether Chief Abbott's order that Ms. Deputy submit to a PBT was reasonable under the Fourth Amendment. [Filing No. 35 at 7-9; Filing No. 42 at 14-21; Filing No. 46 at 1-7.] The Court agrees with Chief Abbott that his order was reasonable because Ms. Deputy admits that she was at the top of the overtime call-out list, [Filing No. 36-3 at 6], that she was ordered to come to work, [Filing No. 36-3 at 9], and that in response to that order, she said, "Okay, well, I've been drinking[,]" [Filing No. 36-3 at 9]. Ms. Deputy's voluntary admission that she had been drinking underscores the reasonableness of Chief Abbott's subsequent order that she take a PBT, particularly since Ms. Deputy does not dispute that Chief Abbott was trying to determine whether she may be able to work. [Filing No. 36-1 at 4 (Chief Abbott attesting that he ordered the PBT to determine whether it was possible that the alcohol Ms. Deputy had admitted consuming had dissipated, thus permitting her to cover the shift).] The Court also rejects Ms. Deputy's argument that Chief Abbott's alleged failure to follow Seymour's drug testing policies is evidence of unreasonableness, [Filing No. 42 at 20-21], because evidence of department policies is "irrelevant in the Fourth Amendment reasonableness analysis[,]" *Scott*, 346 F.3d at 760.

13

("[T]he possibility or even probability of a future adverse employment action—as opposed to physical detention—cannot enter our analysis of whether the officers in this case were seized.") (emphasis omitted). Rather, "the relevant constitutional inquiry must focus on whether reasonable people in the position of the subordinate officers would have feared *seizure or detention* if they had refused to obey the commands given by their superior officers." *Id.* (emphasis in original).

Ms. Deputy focuses her entire Fourth Amendment claim on the employment consequences she contends she suffered as a result of refusing Chief Abbott's order to take a PBT. Based on Seventh Circuit case law, the "possibility or even probability of a future adverse employment action" cannot enter the Court's analysis. *See, e.g.*, *Driebel, 298 F.3d at 642*. Instead, the proper focus is whether a reasonable person in Ms. Deputy's position would have feared seizure or detention if she refused Chief Abbott's order to take the PBT. *Id.* Ms. Deputy does not argue that a reasonable person in her position would have feared seizure or detention for refusing Chief Abbott's order, perhaps because the Seventh Circuit has cited a Sixth Circuit Court of Appeals case holding the opposite. *See Carter, 743 F.3d at 544* (citing *Pennington v. Metro. Gov't of Nashville & Davidson Cnty., 511 F.3d 647, 652 (6th Cir. 2008)* (holding that "[a] reasonable off-duty officer in [the subordinate's] position would not have feared seizure or detention if he had refused to take the breathalyzer test")). Regardless of her reasoning, by

focusing exclusively on her adverse employment action, Ms. Deputy's Fourth Amendment claim fails as a matter of law.[5]

### ii. Retaliation Claim

Ms. Deputy also asserts a retaliation claim, alleging that she was unlawfully terminated for exercising her Fourth Amendment rights by refusing Chief Abbott's order that she take a PBT. [Filing No. 42 at 10-11; Filing No. 42 at 22-24.] While Ms. Deputy concedes that she was an at-will employee "subject to termination for any reason other than those prohibited by the Constitution or statute," she contends that a reasonable jury could find that Chief Abbott terminated her for exercising her Fourth Amendment rights. [Filing No. 42 at 10-11.]

Chief Abbott argues that he is entitled to qualified immunity on Ms. Deputy's retaliation claim. [Filing No. 46 at 8-10.] He emphasizes the "total absence of any controlling case law." [Filing No. 46 at 10.]

Under the circumstances presented here, the Court considers it most prudent to proceed to the second question regarding qualified immunity—whether the right at issue was clearly established at the time of the violation. *See Pearson v. Callahan, 555 U.S. 223, 239 (2009)*

---

[5] Ms. Deputy cites an Eastern District of Wisconsin case to support her argument that drug testing off-duty employees at home violates the Fourth Amendment. *Grow v. City of Milwaukee, 84 F.Supp.2d 990 (E.D. Wis. 2000)*, disapproved of in part by *Driebel, 298 F.3d at 641-42*. As an initial matter, district court cases "do not render the law clearly established." *Lott v. Pfizer, Inc., 492 F.3d 789, 793 (7th Cir. 2007)*; *see also Anderson v. Romero, 72 F.3d 518, 525 (7th Cir. 1995)* ("[D]istrict court decisions cannot *clearly* establish a constitutional right.") (emphasis in original). The Seventh Circuit expressly "disagree[d] with the *Grow* court's statement concluding that patrolmen are considered to be seized if they are threatened only with job loss and not physical force and a detention of some type." *Driebel, 298 F.3d at 642*. And factually, *Grow* is materially distinguishable from Ms. Deputy's case because unlike the facts of herein, the supervisors in *Grow* refused requests to leave the officers' houses, told the officers they were not free to leave, and transported the officers to police stations in squad cars where drug tests were administered. 84 F.Supp.2d at 994-95. For all of these reasons, the Court concludes that *Grow* is not closely analogous to Ms. Deputy's case and does not render the law in this area clearly established, especially in light of the holdings of *Driebel* and *Carter*.

(confirming that the district court has the "flexibility" to determine the order of decisionmaking regarding the qualified immunity defense). As previously detailed, to determine whether a right is clearly established for purposes of qualified immunity, the Court looks to controlling precedent from both the Supreme Court and the Seventh Circuit Court of Appeals, and if there is no such precedent it "cast[s] a wider net" and examines "all relevant case law to determine whether there was such a clear trend in the case law that [it] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott*, 705 F.3d at 731. "To be clearly established at the time of the challenged conduct, the right's contours must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,' and 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Rabin*, 725 F.3d at 632 (quoting *Humphries*, 702 F.3d at 1006).

Ms. Deputy asserts that her retaliation claim "has considerable support in the case law." [Filing No. 42 at 11.] However, none of the cases Ms. Deputy cites are in the context of retaliation in response to a plaintiff's exercise of Fourth Amendment rights. [Filing No. 42 at 10 (citing *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1294 (7th Cir. 1996) (discussing religious group's claim that regulation was adopted in retaliation for its First Amendment rights to free speech and to petition courts for redress of grievances); Filing No. 42 at 22-24 (citing *Buise v. Hudkins*, 584 F.2d 223 (7th Cir. 1978) (recognizing an inmate's right to not be punished for exercising First Amendment rights); *White v. Napoleon*, 897 F.2d 103, 111 (3d Cir. 1990) (prisoner alleging that doctor filed disciplinary charges against him in retaliation for exercising his Eighth Amendment right to refuse medical treatment); *Mount Healthy City Board of Education v. Doyle*, 429 U.S. 274, 283-84 (1977) (holding that an at-will employee teacher "may nonetheless establish a claim to reinstatement if the decision not to rehire him was

made by reason of his exercise of constitutionally protected First Amendment freedoms");

*Gomez v. Randle*, 680 F.3d 859, 866-67 (7th Cir. 2012) (concluding that prisoner adequately stated First Amendment retaliation claim for transfer after using prison grievance system); *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987) (holding that if prisoner had been able to prove that the defendants transferred him "in retaliation for his attempts to exercise his right to meaningful access to the courts, he would have been entitled to damages"); *Benjamin v. City of Montgomery*, 785 F.2d 959, 963 (11th Cir. 1986) ("a public employee cannot be terminated for refusing to waive fifth amendment rights")).]

The Court recognizes that two Seventh Circuit Court of Appeals cases that Ms. Deputy cites state that "it is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." *Buise*, 584 F.2d at 229; *Gomez*, 680 F.3d at 866. *Buise* and *Gomez* were First Amendment retaliation cases, but Ms. Deputy relies on the cited general statement to support her argument that Chief Abbott violated clearly established law when he fired her for purportedly exercising her Fourth Amendment rights.[6] The Court does not agree.

First, in the context of qualified immunity, the Seventh Circuit has emphasized "[i]mportantly, the right must be clearly established in a particularized sense, rather than in an abstract or general sense." *Abbott*, 705 F.3d at 731. Second, the United States Supreme Court recently granted qualified immunity to a public employer who terminated an employee who

---

[6] The Court recognizes that Chief Abbott disputes this characterization of the reason he terminated Ms. Deputy and attests that he "decided to terminate [Ms. Deputy's] employment for making no effort to show up for work when ordered to do so." [Filing No. 36-1 at 4.] But the matter is before the Court on a motion for summary judgment, which requires the Court to view the facts in the light most favorable to Ms. Deputy. As a result, the Court's decision assumes that Chief Abbott fired Ms. Deputy for refusing his order that she take a PBT.

exercised his First Amendment right to provide truthful sworn testimony outside the scope of his ordinary job responsibilities. *Lane v. Franks*, --- U.S. ---, 134 S.Ct. 2369, 2378-83 (2014). While the Supreme Court recognized that "the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities," *id.* at 2378, it still concluded that the defendant at issue was entitled to qualified immunity on the retaliation claim because "[applicable] precedent did not provide clear notice that subpoenaed testimony concerning information acquired through public employment is speech of a citizen entitled to First Amendment protection," *id.* at 2382-83. In other words, the Supreme Court confirmed that unless applicable precedent provides "clear notice" to the defendant regarding the particularized right at issue, the defendant is entitled to qualified immunity.

Ms. Deputy makes much of Chief Abbott's testimony where he makes purported admissions that certain conduct would constitute unconstitutional retaliation. [Filing No. 42 at 11-13.] But, as noted earlier, even "district court decisions cannot *clearly* establish a constitutional right," *Anderson*, 72 F.3d at 525 (original emphasis), and a police chief's opinion as to constitutional law is an even less authoritative source. By not directing the Court to a single case recognizing a Fourth Amendment retaliation claim, Ms. Deputy has not established that applicable precedent provided clear notice to Chief Abbott of the particularized right at issue.[7] Thus, even if Ms. Deputy's Fourth Amendment retaliation claim is cognizable, the Court concludes that Chief Abbott is entitled to qualified immunity on that claim.

---

[7] Again, "[o]nce the defense of qualified immunity is raised, it becomes the plaintiff's burden to defeat it." *Estate of Escobedo*, 702 F.3d at 404.

## IV.
### CONCLUSION

For the reasons explained herein, the Court **GRANTS** Defendants' Motion for Summary

Judgment on Ms. Deputy's state law claims against Seymour and on her 42 U.S.C. § 1983 claim

against Chief Abbott.  [Filing No. 38.]  Final judgment will be entered accordingly.

**Distribution to counsel of record via CM/ECF:**

Ronald J. Semler
STEPHENSON MOROW & SEMLER
rsemler@stephlaw.com

James Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Richard A. Waples
WAPLES & HANGER
rwaples@wapleshanger.com

Rodney E. Farrow
FARROW & THOMPSON
farrow@farrowthompson.com